**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

**RONALD K. HOBSON, SR.,**
        **Plaintiff,**

        **v.**                                                   **Civil Action No. 26-531 (JDB)**

**GREEN FINANCE AUTHORITY (d/b/a**
**DC GREEN BANK), et al.,**
        **Defendants.**

---

**MEMORANDUM OPINION**

Hobson sued his former employer and supervisors in state court after being fired from his job at the Green Finance Authority (GFA).  Defendants removed to this Court under diversity jurisdiction before being served and Hobson now seeks remand on several grounds: that GFA is not a citizen of the District subject to diversity citizenship removal, that defendants failed to adequately establish individual citizenship or the amount in controversy, and that a forum defendant may not remove before service.

Hobson is incorrect on all three issues.  GFA is a citizen rather than arm of the District because the District structured it as a legally separate entity liable for its own judgments.  Through their opposition filings, defendants have adequately established individual citizenship, as is required to show complete diversity, and have shown by a preponderance of the evidence that the amount in controversy exceeds $75,000.  And under the plain text of the diversity jurisdiction statute, a forum defendant may remove a diversity case to federal court before service.

The court therefore denies Hobson's motion to remand the case to D.C. Superior Court.

1

**Background**

## I.    The Green Finance Authority

GFA is an entity tasked by the D.C. Council with "increas[ing] the use of private funds for sustainable projects and programs by offering and promoting the use of loans, loan guarantees, credit enhancements, bonds, or other financing mechanisms for sustainable projects and programs."  D.C. Code § 8-173.21(b); see also id. § 8-173.01 (declaring GFA's "public purpose" to be "investment by the District" in environmental, conservation, and energy efficiency projects). The Council established GFA as "an instrumentality of the District government" with "a separate legal existence within the District government."  Id. § 8-173.21(a).

GFA has a set of twenty-six enumerated powers, including: to (1) "have perpetual succession"; (2) "sue and be sued in its own name"; (3) "have an official seal and . . . alter that seal"; and (4) "adopt, amend, and repeal bylaws."  Id. § 8-173.22(a)(1)-(4).  GFA also has the authority to "acquire . . . , sell, construct, lease, improve, rehabilitate, repair and otherwise maintain an office," id. § 8-173.22(a)(5), to sell real property, id. § 8-173.22(a)(22), and to enter into contracts and other agreements with private and public entities, see id. § 8-173.22(a)(7)-(8), (12), (17), (24), (26).  And GFA may "issue bonds and give security," but "the Authority's debts shall not be backed by the full faith and credit of the District of Columbia."  Id. § 8-173.22(a)(14); see also id. § 8-173.43(a) (providing that GFA may incur debt by issuing bonds); id. § 8-173.46 ("Bonds issued under the provisions of this chapter do not constitute an obligation of the District and are payable solely from the revenues or assets of the Authority.").

GFA's Board consists of 11 members, with the D.C. mayor appointing all seven voting members with the advice and consent of the D.C. Council.  Id. § 8-173.23(a)-(b).  Board members serve for staggered three-year terms, are not compensated except for expenses, and may be

removed by the mayor for good cause.  Id. § 8-173.23(d)-(e), (h).  The Board appoints an Executive Director to manage GFA.  Id. § 8-173.25(a).  Annually, GFA must submit reports to the D.C. council and mayor on the prior year's activities, undertake an independent audit, and hold a public hearing.  Id. §§ 8-173.51-53.

GFA is funded by D.C. appropriations; federal funds; grants, fees, donations, or gifts; proceeds from any District proceeding, settlement, or contract where the funds have been assigned to GFA; repayments on GFA loans; interest on GFA deposits or investments; and other GFA operational revenue, receipts, and fees.  Id. § 8-173.26(b).  GFA funds do not revert back to D.C. general funds at the end of any fiscal year, and GFA is not required to repay money provided to it by the D.C. government.  Id. §§ 8-173.26(d)(1), 8-173.42.  GFA assets and income as well as GFA bonds and interest are generally exempt from D.C. taxation.  Id. § 8-173.48.  The District also "shall not be liable for any acts or occurrences of the Authority," id. § 8-173.62, and "[t]he District and its officers and employees shall not be liable for and may not be made a party to any lawsuits or claims arising from the operation of the Authority," id. § 8-173.63(c).

## II.    The Dispute

According to the complaint, GFA hired Hobson in January 2022 to lead the D.C. Property Assessed Clean Energy Program (D.C. PACE Program).  Am. Compl. ¶ 12, Dkt. 1-1.  Over time, the employment relationship soured, and GFA fired Hobson in October 2025.  Id. ¶ 89.  Hobson now alleges that GFA engaged in numerous violations of the D.C. Human Rights Act—race and age discrimination, creation of a hostile work environment, and retaliation—as well as defamation. Id. ¶¶ 120-65.  Hobson further alleges that GFA's CEO Brandi Colander and Senior Director of Origination Douglas Wilberding engaged in race discrimination and creation of a hostile work environment, and that Wilberding defamed Hobson.  Id.

Hobson filed his complaint in D.C. Superior Court on January 29, 2026, and amended it a day later. Am. Compl. 35; Compl. 34, Dkt. 1-2. Hobson did not indicate that he is suing either individual defendant in an official capacity. Am. Compl. Civil Info. Sheet, Dkt. 1-7 (Info Sheet). Before service, on February 18, 2026, defendants removed the case to federal court, asserting diversity jurisdiction. See Notice of Removal, Dkt. 1 (citing 28 U.S.C. §§ 1332, 1441, 1446). Specifically, defendants stated that Hobson is alleged to be a Virginia citizen whereas GFA is a D.C. citizen and Colander and Wilberding are D.C. residents. Id. ¶ 4. One week later, defendants filed three motions to dismiss the claims against each defendant. Mots. to Dismiss, Dkts. 5-7.

Hobson now moves for remand on several grounds. Mot. for Remand, Dkt. 9. Primarily, Hobson argues that GFA is an instrumentality of the District and therefore not a citizen of D.C. for purposes of diversity jurisdiction. Id. at 3-8. Hobson further contends that defendants failed to properly plead the citizenship of the individual defendants or carry its burden as to the amount in controversy. Id. at 9-10. Hobson also objects to defendants' "snap" removal to avoid the forum defendant rule. Id. at 11. And finally, Hobson seeks to preserve objections to (1) the completeness of the removal papers, (2) the sufficiency of jurisdictional allegations, (3) timing and service, (4) unanimity requirements, and (5) any other defects. Id. Hobson also requests fees and costs under 28 U.S.C. § 1447(c). Defendants oppose remand. Defs.' Opp'n, Dkt. 11. Hobson did not timely reply. The motion is now ripe for consideration.

## Discussion

Generally, a defendant may remove from state court to federal court a civil action over which the federal court has original jurisdiction. 28 U.S.C. § 1441(a). District courts have original jurisdiction over suits where the amount in controversy exceeds $75,000 between citizens of different states. Id. § 1332(a)(1). Diversity of citizenship must also be "complete," i.e., diversity

4

jurisdiction "applies only to cases in which the citizenship of each plaintiff is diverse from the citizenship of each defendant." Caterpillar Inc. v. Lewis, 519 U.S. 61, 68 (1996). However, under the forum-defendant rule, a civil action otherwise removable based solely on diversity jurisdiction "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2).

To remove a case to federal court, a defendant generally must file a notice of removal in federal district court within 30 days of service. See id. § 1446(a)-(b); Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc., 526 U.S. 344, 354 (1999). A motion to remand on the basis of any defect other than lack of subject matter jurisdiction must be made within 30 days of the notice of removal. 28 U.S.C. § 1447(c).

The removing party bears the burden of proving federal jurisdiction. Downey v. Ambassador Dev., 568 F. Supp. 2d 28, 30 (D.D.C. 2008) (citations omitted). And in view of federalism concerns, courts construe the scope of removal jurisdiction narrowly and remand where jurisdiction is doubtful. Id. (citations omitted); see also Organic Consumers Ass'n v. Handsome Brook Farm Grp. 2, 222 F. Supp. 3d 74, 76-77 (D.D.C. 2016) ("Bearing in mind the risk of encroaching on state courts' purview, courts construe removal jurisdiction narrowly and tend to resolve factual ambiguities in favor of remand." (citations omitted)); Colon v. Ashby, 314 F. Supp. 3d 116, 120 (D.D.C. 2018) ("The court must assume all of the facts set forth by the plaintiff to be true and resolve all uncertainties as to state substantive law in favor of the plaintiff." (citation modified)).

Defendants' theory of removal here is diversity jurisdiction. See Notice of Removal 2. Hobson contends that defendants have failed to carry their removal burden on numerous grounds, and the Court will address each in turn.

## I.    Whether GFA is an instrumentality of the District

Primarily, Hobson argues that GFA is an instrumentality of the District and therefore is not a citizen of the District subject to diversity jurisdiction removal.  Mot. for Remand 3-9.  That is incorrect.

"[A] State is not a 'citizen' for purposes of the diversity jurisdiction."  Moor v. Alameda County, 411 U.S. 693, 717 (1973).  Following that logic, the District is not a citizen of the District. Long v. District of Columbia, 820 F.2d 409, 414 (D.C. Cir. 1987).  The question is therefore whether GFA is "simply 'the arm or alter ego of the State," such that it, too, is not "a citizen of the State for diversity purposes."  Moor, 411 U.S. at 717 (citations omitted).

Albeit in the context of state sovereign immunity, the Supreme Court recently clarified its arm-of-the-state test.  "Whether an entity is an arm of the State is a question of federal law that can be answered only after considering the provisions of state law that define the agency's character."  Galette v. N.J. Transit Corp., 146 S. Ct. 854, 865 (2026) (citation modified).  The "predominant[]" consideration in an arm-of-the-state inquiry is "whether the State structured the entity as a legally separate entity liable for its own judgments."  Id. at 868.  The "clearest evidence that a State has created a legally separate entity is that it created a corporation with the traditional corporate powers to sue and be sued, hold property, make contracts, and incur debt."  Id. (citations omitted).  But the corporate form "is not the only structure that signals the State has created a legally separate entity"; for example, "the entity could be described as a 'separate legal entity.'" Id. (citation omitted).  "In contrast to formal legal liability, an entity's practical financial relationship with the State . . . has less relevance[,]" as does "a State's history of subsidizing an

6

entity." Id. at 869.  Although "courts may consider the degree of control the State exerts over the entity," this is "not especially probative."  Id.[1]

In Galette, the Court ruled that the New Jersey Transit Corporation was not an arm of the state because it was structured as a legally separate entity and New Jersey was not formally liable for the Corporation's debts or liabilities.  Id. at 871.  The control that New Jersey exerted over the Corporation did not change that conclusion.  Id. at 871-72.  So too here.

GFA was established to have a "separate legal existence within the District government."  D.C. Code § 8-173.21(a).  Granted, GFA is also designated as an "instrumentality" of the District, id.; see also Mot. for Remand 3, but that term "lacks . . . historical weight," Galette, 146 S. Ct. at 871; see also id. at 875 (rejecting argument that state's label is dispositive, especially when labels are contradictory).  And to be sure, GFA is not formally structured as a corporation, although "the 'corporation' label itself is not dispositive."  Id. at 872.[2]  Instead, what matters is whether the entity has "all the hallmarks of separate legal personhood, such as the power to sue and be sued, make contracts, and hold property in its own name, which all indicate that it is not an arm of the State."  Id.  Here, GFA has these very hallmarks.  See D.C. Code § 8-173.22(a)(2) (power to sue and be sued); (5), (22) (power to buy and sell real property); (7)-(8), (12), (17), (24), (26) (power to make contracts).

---

[1] Separately but relatedly, a state may be the "real party in interest," for example if damages are sought against a state officer in their official capacity or if a particular remedy runs directly against the state.  Id. at 870.  Hobson does not argue that the District is the real party in interest, so the Court has no occasion to address that issue.  See id. at 871 n.6.

[2] GFA's first five powers under D.C. Code § 8-173.22(a)(1)-(5)—to have perpetual succession, sue and be sued, have an official seal, adopt bylaws, and buy and sell an office—are in fact the five traditional powers of a corporation.  See W. Blackstone, Commentaries on the Laws of England 475 (21st ed. 1854) (listing incidents of a corporation as (1) to have perpetual succession, (2) to sue or be sued, (3) to buy and hold land, (4) to have a common seal, and (5) to make bylaws).

The District is also not formally liable for GFA's debts or liabilities. See D.C. Code §§ 8-173.22(a)(14) ("[T]he Authority's debts shall not be backed by the full faith and credit of the District of Columbia."), 8-173.46 ("Bonds issued under the provisions of this chapter do not constitute an obligation of the District and are payable solely from the revenues or assets of the Authority. . . ."); 8-173.62 (The District "shall not be liable for any acts or occurrences of the Authority."); 8-173.63(c) ("The District and its officers and employees shall not be liable for and may not be made a party to any lawsuits or claims arising from the operation of the Authority."). And although the District appoints all voting members of the Board, id. § 8-173.23(a)-(b); see also Mot. for Remand 7, in Galette the N.J. governor's similar appointment and for-cause removal powers over the Corporation's Board did not make that entity an arm of the state, 146 S. Ct. at 871-72.

Hobson's other arguments for why GFA is an arm of the state are equally unavailing. For one, Hobson points out that GFA enjoys certain tax immunities. See Mot. for Remand 3, 8; D.C. Code § 8-173.48. However, rejecting reliance on precedent discussing "intergovernmental tax immunity," Galette emphasized that "an entity can count as part of the State for some but not other purposes," 146 S. Ct. at 874 (citation modified). Hobson also highlights that GFA carries out public policy objectives, see Mot. for Remand 3, 8; D.C. Code § 8-173.01, but Galette explained that the arm-of-the-state analysis "focuses not on whether the entity serves public functions, but rather on whether the State has chosen to serve those public functions through its own apparatus or through that of a legally separate entity," 146 S. Ct. at 873. Additionally, Hobson underscores that GFA receives and relies on funding from the District, see Mot. for Remand 4, 8, D.C. Code § 8-173.6(b)(1), but Galette discounted the "practical reality of [an entity's] financial relationship with the State," 146 S. Ct. at 873. And finally, Galette's focus on legal separability and formal

8

liability also forecloses Hobson's appeal to GFA's "lack of operational independence" or its "public accountability framework" of governance, transparency, and reporting requirements. Mot. for Remand 4, 8.

Accordingly, GFA is not an arm of the District and is instead a citizen of the District subject to diversity jurisdiction.

## II. Whether defendants adequately establish individual citizenship and amount in controversy

Hobson also contends that defendants failed to adequately establish the citizenship of Colander and Wilberding or the amount in controversy. Defendants have now cured the deficiency as to individual citizenship and provided sufficient support for the disputed amount in controversy.

The D.C. Circuit has explained that "an allegation of residence alone is insufficient to establish the citizenship necessary for diversity jurisdiction." Novak v. Capital Mgmt. & Dev. Corp., 452 F.3d 902, 906 (D.C. Cir. 2006) (quotation omitted); see also Nytes v. Trustify, Inc., 297 F. Supp. 3d 191, 198 (D.D.C. 2018) (explaining that an individual is a citizen of the state where he is "domiciled," which in turn is determined by "physical presence" and "intent to remain there for an unspecified or indefinite period of time" (quotations omitted)). "[F]ailing to establish citizenship is not a mere technicality." Novak, 452 F.3d at 906. Nevertheless, "under the liberal amendment rule of 28 U.S.C. § 1653, a party who has not proved, or even alleged, that diversity exists may amend his pleadings even as late as on appeal." Id. n.5 (citation modified).

Defendants attached to their opposition sworn affidavits from Colander and Wilberding attesting that they both not only reside in the District and pay state tax here but also intend to live in the District indefinitely. Defs.' Ex. A ¶¶ 1-2, 4-5, Dkt. 11-1; Defs.' Ex. B ¶¶ 1, 3-5, Dkt. 11-2. That satisfies the requirement of establishing citizenship and thus demonstrating complete

diversity. See Nytes, 297 F. Supp. 3d at 198 (listing indicia of domiciliary status, including current residence, sworn declarations of domicile, and payment of taxes).

Turning next to the amount in controversy, "[w]hen a plaintiff invokes federal-court jurisdiction, the plaintiff's amount-in-controversy allegation is accepted if made in good faith." Dart Cherokee Basin Operating Co. v. Owens, 574 U.S. 81, 87 (2014) (citation omitted). "Similarly, when a defendant seeks federal-court adjudication, the defendant's amount-in-controversy allegation should be accepted when not contested by the plaintiff or questioned by the court." Id. But if the plaintiff "contests the defendant's allegation," then removal is only proper "'if the district court finds, by the preponderance of the evidence, that the amount in controversy exceeds' the jurisdictional threshold." Id. at 88 (quoting 28 U.S.C. § 1446(c)(2)(B)). Because Hobson is challenging the amount in controversy, "both sides [must] submit proof" to support their position. Id.

Here, defendants have submitted Hobson's pre-litigation demand, in which he demanded $2.5 million based on "conservative assumptions." Defs.' Ex. C at 15, Dkt. 11-3. Colander also attests that Hobson's annual salary was $175,440, so providing backpay alone as of today would already almost exceed the $75,000 amount in controversy requirement. Defs.' Ex. A ¶ 6. Hobson's only response is the conclusory assertion that reliance "on settlement posture" does not satisfy the jurisdictional burden of proof. Mot. to Remand 10. But Hobson's complaint itself seeks compensatory damages, back and front pay, punitive damages, pre- and post-judgment interest, and reasonable attorney's fees and other costs. Am. Compl. 34-35. And the civil information sheet makes a $5 million demand. Info Sheet at 1. Thus, based on the relief requested in the complaint, the information sheet, and the undisputed evidence of Hobson's salary, the Court finds by a preponderance of the evidence that the amount in controversy exceeds $75,000.

### III.    Whether "snap" removal is permissible

Hobson next argues that defendants cannot "rely on removal prior to service to avoid the forum-defendant rule" because "subject-matter jurisdiction must be established independently of removal mechanics" and "snap" removal of a case before service of a forum defendant "undermines the purpose of the forum-defendant rule." Mot. for Remand 11.[3]  He is mistaken.

The forum-defendant rule provides that diversity jurisdiction cases "may not be removed if any of the parties in interest properly joined and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b)(2). This rule makes sense because any concerns about favoritism for in-state litigants or discrimination against out-of-state litigants are alleviated where at least one defendant is from that state. See Encompass Ins. v. Stone Mansion Rest. Inc., 902 F.3d 147, 153 (3d Cir. 2018). "The specific purpose of the 'properly joined and served' language in the forum defendant rule is less obvious." Id.  The rule was intended to combat the problem of fraudulent joinder, whereby plaintiffs would nominally join an in-state defendant whom they would never serve and against whom they had no intention of proceeding in order to defeat diversity jurisdiction and avoid removal. See Doe v. Daversa Partners, Civ. A. No. 20-3759, 2021 WL 736734, at *3 (D.D.C. Feb. 25, 2021) (citing Encompass, 902 F.3d at 153; Gibbons v. Bristol-Myers Squibb Co., 919 F.3d 699, 706 (2d Cir. 2019)).

However, the plain text of the statute permits removal where the forum defendant has yet to be "properly . . . served." 28 U.S.C. § 1441(a), (b)(2). Granted, the possibility of snap removal arguably presents a loophole that allows sophisticated defendants to engage in forum shopping that would otherwise be unavailable to them. However, "courts have 'no roving license, even in

---

[3] It is unclear whether Hobson is arguing that violation of the forum-defendant rule is a jurisdictional defect. The Court notes that all ten circuits to have addressed this issue have held that it is nonjurisdictional. See Holbein v. TAW Enters., Inc., 983 F.3d 1049, 1053 (8th Cir. 2020) (collecting cases).

11

ordinary cases of statutory interpretation, to disregard the clear language simply on the view that . . . Congress must have intended something broader.'"  Doe, 2021 WL 736734, at *4 (quoting Michigan v. Bay Mills Indian Cmty., 572 U.S. 782, 794 (2014)).  And adhering to the plain text of the rule does not contravene the purpose of prohibiting fraudulent joinder.  See id. (quoting Encompass Ins., 902 F.3d at 153).  Instead, Congress is free to amend the forum-defendant rule if it wishes to prevent snap removals.  See, e.g., Kevin M. Lewis, Cong. Rsch. Serv., LSB10380, Make it Snappy? Congress Debates "Snap" Removals of Lawsuits to Federal Court (2020).

This reading also comports with the views of the only three circuits to have squarely addressed the issue.  See Encompass, 902 F.3d at 154; Gibbons, 919 F.3d at 707; Texas Brine Co. v. Am. Arbitration Ass'n, 955 F.3d 482 (5th Cir. 2020).  The Third Circuit held that the plain text "unambiguous[ly]" permitted pre-service removal by a forum defendant and that the "peculiar" effect of enabling a defendant "to use pre-service machinations to remove a case that it otherwise could not" was "not so outlandish as to constitute an absurd or bizarre result."  Encompass, 902 F.3d at 152-54.  Following Encompass, the Second Circuit agreed that the statutory text is unambiguous and rejected arguments based on the absurdity of that reading or non-uniform application of the forum defendant rule based on state law differences in service requirements. Gibbons, 919 F.3d at 704-07.  In doing so, Gibbons highlighted that Congress might well have intended to create a "bright-line rule keyed on service, which is clearly more easily administered than a fact-specific inquiry into a plaintiff's intent or opportunity to actually serve a home-state defendant."  Id. at 706.  The Fifth Circuit likewise agreed on the plain meaning of the statute and rejected arguments based on absurdity or congressional intent, although it also found it "[o]f some importance" that the removing party there was an out-of-state defendant rather than either of the

12

two in-state defendants.  Texas Brine, 955 F.3d at 486-87.[4]  The Court agrees with that persuasive weight of authority from other circuits that snap removal is permissible.

Thus, there is no defect in removal despite defendants being citizens of the District of Columbia.

## IV.     Other objections and claims

Finally, in a bullet point list, Hobson seeks to preserve procedural objections about the completeness of the removal papers, defendant unanimity on removal, and any other defects.  Mot. for Remand 11.  Hobson also seeks fees and costs under 28 U.S.C. § 1447(c).  Id. at 12.

As to his cursory objections, an argument is forfeited if the party is "obscure on the issue in the[] opening brief . . . .'"  Twin Rivers Paper Co. v. SEC, 943 F.3d 607, 615 (D.C. Cir. 2019) (quotation omitted).  In any event, there is no indication that the removal papers are incomplete or that any defendant opposed removal.  And because the Court finds that remand is not warranted, it need not address Hobson's arguments for fees and costs under 28 U.S.C. § 1447(c).

## CONCLUSION

For the foregoing reasons, the Court will deny Hobson's motion to remand.  A separate order will accompany this opinion.

/s/
JOHN D. BATES
United States District Judge

Date: March 31, 2026

---

[4] In a footnote, the Sixth Circuit has stated that "the inclusion of an unserved resident defendant in the action does not defeat removal under 28 U.S.C. § 1441(b).  McCall v. Scott, 239 F.3d 808, 815 (6th Cir. 2001) (citations omitted).  The Fifth Circuit views that footnote as interpreting section 1441(b) to allow snap removal, Texas Brine, 955 F.3d at 485, although it is unclear to this Court whether the footnote refers to snap removal or fraudulent joinder.

Granted, the Eleventh Circuit has sharply criticized snap removal—correctly in this Court's view—referring to it as "gamesmanship" to get into federal court "based on a technicality" that is "not at the core of what the removal statute protects."  Goodwin v. Reynolds, 757 F.3d 1216, 1221-22 (11th Cir. 2014).  However, Goodwin assumed without deciding that such removal was permissible, ruling only that the district court did not abuse its discretion in granting the plaintiff's motion to dismiss the case without prejudice under Rule 41(a)(2) so she could refile in state court.  Id. at 1218, 1221.