**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **RONALD K. HOBSON, SR.,**<br>        **Plaintiff,**<br><br>        v.<br><br>**GREEN FINANCE AUTHORITY (d/b/a<br>DC GREEN BANK), et al.,**<br>        **Defendants.** | **Civil Action No. 26-531 (JDB)** |

**MEMORANDUM OPINION**

Hobson is a former employee of the Green Finance Authority (GFA). He alleges that, following a change in his supervisor and his raising of performance, governance, discrimination and retaliation concerns, GFA gradually diminished and undermined his authority, and ultimately fired him. After his termination, Hobson sued GFA, GFA's CEO Brandi Colander, and his supervisor Douglas Wilberding, asserting claims of race discrimination, age discrimination, hostile work environment, retaliation, and defamation. Defendants moved to dismiss all claims.

Hobson fails to state a race or age discrimination claim because the alleged facts do not give rise to a reasonable inference of discrimination, either directly or through an assessment of comparators. His hostile work environment claim is dismissed because he fails to plausibly allege either that any harassment was connected to a protected status or that it was severe or pervasive enough to constitute an abusive working environment. Hobson's retaliation claim is dismissed for failure to sufficiently allege engagement in a statutorily protected activity. Finally, his defamation claim fails because the statements at issue are not reasonably capable of a defamatory meaning and he does not plausibly allege that they were not privileged intracompany communications. Accordingly, the Court will dismiss all claims as to all defendants.

1

## Background

### I.    Factual Background

The following facts are drawn from Hobson's complaint and accepted as true for the purposes of this motion to dismiss.  Hobson is Black, was 65 years old when he was fired, and has over 40 years of experience in banking, clean energy, and program leadership.  First Am. Compl. ¶¶ 10-11, Dkt. 1-1 (Compl. or FAC).  GFA hired Hobson in January 2022 to lead the District of Columbia Property Assessed Clean Energy Program (PACE), and he was eventually promoted to Director of PACE.  Id. ¶ 12.  For three years, Hobson led twenty PACE loan closings—expanding the PACE loan portfolio from $55 million to $135 million—and neither GFA nor any D.C. agency declined, reversed, or found noncompliant any transaction.  Id. ¶ 15-16.  Until his supervisor changed, Hobson's performance reviews rated his attendance and participation as good or even "outstanding."  Id. ¶ 19.

In July 2024, Hobson raised performance and governance concerns regarding errors by his subordinate, Natrebo Douglas.  Id. ¶ 21.  Through its Chief Investment Officer, Sri Sekar, GFA imposed "nonstandard 'triangular' meetings" between Sekar, Douglas, and Hobson, rather than proceeding through "ordinary management channels" as for similarly situated managers.  Id. ¶¶ 23, 25.  In April 2025, disputes arose regarding leave, availability, and "exclusion from key functions."  Id. ¶ 27.  On April 29, 2025, Hobson filed a formal complaint of discriminatory and retaliatory conduct with Human Resources (HR).  Id. ¶ 28.  In discussions about Hobson's complaint, Sekar said that "[Hobson] needs to feel uncomfortable."  Id. ¶ 31.  HR then directed Hobson not to attend key meetings.  Id. ¶ 32.

In early September 2025, GFA reassigned Hobson to report to Douglas Wilberding, GFA's Senior Director of Origination and a white man.  Id. ¶¶ 9, 37.  Hobson complained to Brandi

2

Colander, GFA's CEO, that Wilberding had previously "avoided direct engagement" with him, including by "repositioning or closing computer monitors in a manner that prevented face-to-face communication."   Id. ¶ 38.   Hobson also complained to HR consultant Jalisa Johnson about Wilberding's conduct, and Johnson suggested that Hobson consider working in a consultant capacity.   Id. ¶¶ 39, 62.   At a GFA Board meeting the next day, executives reported that PACE was "performing strongly" and raised no concerns about Hobson's performance.   Id. ¶¶ 35-36. Wilberding and others then increasingly excluded Hobson from meetings and other activities key to his role, reassigning his responsibilities and interfering with his ability to function in his position.   Id. ¶¶ 41-43.   Hobson was on approved leave on September 26, 2025, when a deal was supposed to close, and executives later raised concerns about the deal.   Id. ¶¶ 45-46.   However, Hobson answered questions from Wilberding and Colander about the transaction, it ultimately closed successfully, and the borrower stated that Hobson "helped a great deal."   Id. ¶¶ 45-47.

In mid-October 2025, Hobson complained to HR initially about being sidelined from his duties and later about Wilberding's performance, but HR consolidated Hobson's complaints with one by Wilberding against Hobson in which Wilberding claimed that Hobson had been "away from the office for two months."   Id. ¶¶ 48-49, 54, 57.   According to Hobson, he continued to carry out substantive work duties during his approved leave and business travel.   Id. ¶ 58.   Wilberding told Hobson within a day of Hobson's first October complaint that organizational changes were coming, postponing earlier-approved changes to PACE guidelines that were ultimately never implemented.   Id. ¶¶ 50-53.   Shortly after Hobson's second October complaint, his supervisory authority over Douglas was "removed or diminished" and Douglas's role was "rapidly elevated." Id. ¶ 56.

Later in October, Hobson and Wilberding's working relationship deteriorated further.  In a three-way meeting between Hobson, Wilberding, and Johnson on October 17, 2025, Wilberding made allegations about "fee treatment" and "underwriting/diligence obligations" as well as a remark that "'$4 million' would go into [the] 'pocket'" of Lynn Hackney, representative for the borrower on the 950 3rd Street NW project.  Id. ¶¶ 62, 66-67, 71, 74.  Wilberding also said in the presence of other GFA employees that Hackney was "gaming the system," "in financial trouble," "improperly extracting personal financial benefit from the transaction," and "winning" while GFA was "losing."  Id. ¶ 67.  And Wilberding further stated in front of two GFA colleagues that the capital provider's representative was "acting like" an "employee of" Hackney and was improperly conducting himself as an agent of the borrower instead of as an independent lender.  Id. ¶ 68.  Wilberding concluded that GFA would "never do business" with Hackney again.  Id. ¶ 69.  In the same meeting with HR, Wilberding "asserted or insinuated" that Hobson himself had been acting improperly by showing "favoritism" toward Hackney and "aligning with or advocating for the borrower rather than performing his role as DC Green Bank's PACE Program Director."  Id. ¶ 71.  On information and belief, Hobson alleges that Wilberding had previously applied to work for Hackney's company and been rejected.  Id. ¶ 73.  Hobson requested a joint call with the capital provider to verify the facts, but Wilberding refused, and HR allegedly did not conduct a fair investigation.  Id. ¶ 63-64.  Hackney later stated that the $4 million in question was capitalized interest.  Id. ¶ 91.

The same day as the HR meeting with Wilberding, Hobson submitted an anonymous report raising concerns about GFA governance failures, discriminatory conduct, retaliatory exclusion, and breakdowns in managerial oversight, requesting Board review of the individuals involved.  Id. ¶¶ 78-79.  Hobson alleges that GFA did not seek information from Hobson or the named

individuals, otherwise meaningfully investigate the anonymous complaint, or implement other corrective measures.  Id. ¶¶ 80-81.  On October 20, 2025, according to Hobson, he submitted a written rebuttal to Wilberding's claims along with supporting documentation but GFA did not meaningfully review his submission.  Id. ¶¶ 76-77.  And on October 29, Hobson spoke with the D.C. Office of the Attorney General (OAG) about issues arising from Wilberding's alleged disregard for program terms that Hobson had previously issued in accordance with PACE guidelines, resulting in additional fees.  Id. ¶ 82.  OAG told Hobson that it would contact GFA's counsel about the issue.  Id. ¶ 85.  The next day, Hobson obtained confirmation that an over $400 million deal was progressing.  Id. ¶ 88.  That deal, which Hobson had been leading since May 2025, was the largest PACE deal in the United States at the time and would ultimately close in December 2025.  Id. ¶¶ 17, 88.  GFA fired Hobson a day later, on October 31, 2025.  Id. ¶ 89.

Hobson offers two comparators to show disparate treatment: Derrick Halloway, a Black Associate Director of Originations, id. ¶¶ 98-103, and Gabriela Kluzinski, a white member of the GFA investment team, id. ¶¶ 109-114.  Hobson claims that Wilberding "engaged in materially similar exclusionary and obstructive conduct" toward Halloway, including by refusing to hold or canceling meetings, failing to timely respond to communications, excluding Halloway from discussions necessary to his role, and presenting Halloway's deals as his own.  Id. ¶¶ 98-99.  Halloway complained to HR as well as Colander, and GFA took "corrective action" by reassigning him to another supervisor.  Id. ¶¶ 100-03.  By contrast, Kluzinski received "regular access" to Wilberding, "was not excluded from meetings" and "was not isolated from core investment or governance decisions."  Id. ¶ 110.  Moreover, GFA allowed Kluzinski to work remotely from Poland for around 30 days without criticism or adverse consequences.  Id. ¶ 111.

More broadly, Hobson alleges that Wilberding "engaged in a pattern of hostile, exclusionary, and obstructive conduct" toward other Black employees.  Id. ¶ 93.  Specifically, Hobson asserts that in multiple meetings attended by Black employees, Wilberding "became visibly frustrated when substantive questions or concerns were raised, abruptly exited . . . without explanation, and failed to return."  Id. ¶ 94.  Finally, Hobson claims that GFA "expanded the authority, visibility, and advancement opportunities of younger employees and employees outside [Hobson's] protected classes, including individuals with less experience."  Id. ¶ 117.

## II.   Procedural History

Hobson filed suit in D.C. Superior Court, alleging that GFA engaged in (1) race and (2) age discrimination, (3) creation of a hostile work environment, and (4) retaliation in violation of the D.C. Human Rights Act (DCHRA), as well as (5) common law defamation.  Hobson further alleges that GFA's CEO Brandi Colander and Senior Director of Origination Douglas Wilberding engaged in race discrimination and creation of a hostile work environment, and that Wilberding defamed Hobson.  Hobson is suing Colander and Wilberding in their personal capacities.  Compl. Civil Info. Sheet, Dkt. 1-7 (Info Sheet) (leaving blank box for official capacity suit).  Defendants removed the case to federal court, asserting diversity jurisdiction, see Notice of Removal, Dkt. 1 (citing 28 U.S.C. §§ 1332, 1441, 1446), and the Court denied Hobson's subsequent motion to remand, Hobson v. Green Fin. Auth., Civ. A. No. 26-531, 2026 WL 880014 (D.D.C. Mar. 31, 2026).

In parallel, GFA, Colander, and Wilberding each moved to dismiss Hobson's suit under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.  Mots. to Dismiss, Dkts. 5 (GFA), 6 (Colander), 7 (Wilberding).  Hobson has opposed each motion.  Opp'ns, Dkts. 12 (Colander), 13 (GFA), 14 (Wilberding).  And the defendants have each now replied.  Replies,

Dkts. 17 (GFA), 18 (Colander), 19 (Wilberding).  The motions are therefore now ripe for resolution.

## Discussion

"To survive a motion to dismiss [under Rule 12(b)(6) for failure to state a claim], a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)).  Courts "must accept as true" all factual allegations but not legal conclusions.  Id.  And courts analyze DCHRA discrimination claims in the same way as claims under the federal antidiscrimination laws.  Vatel v. All. of Auto Mfrs., 627 F.3d 1245, 1246 (D.C. Cir. 2011).

### I.    Race Discrimination

Hobson alleges that all defendants engaged in race discrimination in violation of the DCHRA.   D.C. Code  § 2-1402.11(a)(1)(A).   A prima facie case of disparate-treatment discrimination under the DCHRA requires that a plaintiff show (1) membership in a protected class and (2) an adverse employment action (3) giving rise to an inference of discrimination.  Czekalski v. Peters, 475 F.3d 360, 364 (D.C. Cir. 2007); see also Brown v. Trinity Wash. Univ., Civ. A. No. 22-1612 (JDB), 2023 WL 2571729, at *8 (D.D.C. Mar. 20, 2023) (same).[1]  Supervisors may be liable for aiding and abetting such conduct if they knew or should have known of the conduct and failed to stop it.  King v. Triser Salons, LLC, 815 F. Supp. 2d 328, 331-32 (D.D.C. 2011).

A plaintiff may satisfy the third prong by, for example, showing different treatment compared to similarly situated employees who are not part of the protected class or that the

---

[1] While a plaintiff need not "plead the elements of a prima facie case," he must still allege sufficient facts to allow the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Brown v. Sessoms, 774 F.3d 1016, 1023 (D.C. Cir. 2014) (first quoting Brady v. Off. of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008); then quoting Iqbal, 556 U.S. at 678).  So, too, for the age discrimination claim addressed below.

nondiscriminatory explanation proffered by the defendant for the adverse action was false.  See Brown, 2023 WL 2571729, at *8.  Another employee is similarly situated when she was "charged with offenses of comparable seriousness" and "all of the relevant aspects of her employment situation were nearly identical."  Evans v. District of Columbia, 219 F. Supp. 3d 99, 108 (D.D.C. 2016) (quoting Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1115 (D.C. Cir. 2016)). "Factors that bear on whether someone is an appropriate comparator include the similarity of the plaintiff's and the putative comparator's job and job duties, whether they were disciplined by the same supervisor, and, in cases involving discipline, the similarity of their offenses."  Id. (quoting Wheeler, 812 F.3d at 1115).  "[D]etermining whether two employees are similarly situated is ordinarily a question of fact for the jury."  Wheeler, 812 F.3d at 1116.

Here, Hobson fails to plausibly allege discrimination because the facts do not give rise to a reasonable inference of discrimination.  Hobson does not allege direct evidence of discrimination, relying instead on comparator evidence.  However, he fails to allege that Kluzinski held similar positions or reporting chains.  Contrast Compl. ¶¶ 12, 17, 37, 88 (Hobson was Director of PACE, leading nine-figure, record-breaking deals, and was assigned to report to Wilberding), with id. ¶ 109-10 (Kluzinski was a member of GFA's investment team and had "regular access" to Wilberding).  And, taking as true that Hobson continued to perform substantive duties while away from the office, he was still away for twice as long as Kluzinski and partly on leave, whereas she was working.  Contrast id. ¶ 57-58 (stating that the narrative of being "away from the office for two months" was false because Hobson had approved leave and business travel and continued to perform substantive work), with id. ¶ 111 (Kluzinski was permitted to work remotely for 30 days).

Wilberding also raised other concerns about Hobson's performance unrelated to attendance, further limiting the similarity with Kluzinski. See id. ¶ 62 (complaining about "fee treatment, underwriting/diligence obligations" and the $4 million dispute as to the 950 3rd St NW project). Those differences distinguish this case from, for example, Sessoms, 774 F.3d at 1023-24, where the D.C. Circuit found that the plaintiff sufficiently pled race discrimination. There, a Black applicant for law school tenure was denied while a white applicant who similarly did not meet the publication requirement and was no more—or perhaps less—qualified was approved. Id. at 1019, 1023. Here, the similarities alleged between Hobson and Kluzinski are far less.

Hobson also offers evidence of a differently-treated employee of the same protected class: Derrick Halloway. But GFA took "corrective action" when Halloway, another Black employee, complained about Wilberding's supervision. Compl. ¶ 102. So, the lack of such action for Hobson is more suggestive of issues specific to Hobson than of racial discrimination. And, at least in some contexts, different outcomes for members of the same protected class can undermine a claim of employment discrimination. See Murray v. Gilmore, 406 F.3d 708, 715 (D.C. Cir. 2005) (explaining that replacement of fired worker with member of "same protected class cuts strongly against any inference of discrimination"). Finally, Hobson's more general allegation that Wilberding walked out of multiple meetings attended by Black employees is untethered to any adverse actions or comparison to meetings attended by white employees. See Compl. ¶ 94. Nor does the complaint make clear that there were only Black attendees at these meetings, and Hobson's claim would be weaker still if white employees were present. Moreover, the DCHRA "is not a general civility code that permits recovery for ordinary tribulations of the workplace." Easaw v. Newport, 253 F. Supp. 3d 22, 31 (D.D.C. 2017) (citation modified).

In response, Hobson contends that exact identity is not required. Opp'n to GFA Mot. to Dismiss 8 (citing Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114-15 (D.C. Cir. 2000); George v. Leavitt, 407 F.3d 405, 414 (D.C. Cir. 2005)). True enough. But the cases Hobson cites for that proposition do not help him. Sparrow's standard that a complaint passes muster "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief," 216 F.3d at 1114 (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)), is no longer good law, Easaw, 253 F. Supp. 3d at 29 n.4 (collecting cases so holding); see also Twombly, 550 U.S. at 563 (explaining that Conley's language "is best forgotten as an incomplete, negative gloss on an accepted pleading standard" that "has earned its retirement"). In Burley, the D.C. Circuit held that a conductor and engineer were not similarly situated with respect to a train derailment, affirming a district court's grant of summary judgment to Amtrak. 801 F.3d at 301. In contrast, the comparators in George were all engineers, so they had the same role. 407 F.3d at 414-15. As explained above, this case is more like Burley than George because Hobson has so far failed to plead sufficient facts to plausibly allege that Kluzinski is an appropriate comparator.

In sum, Hobson's best evidence for racial discrimination is the comparison with Kluzinski, but Hobson's complaint simply fails to allege sufficient facts to plausibly suggest she is similarly situated. Accordingly, Hobson has failed to "nudge[] [his race discrimination] claim[] across the line from conceivable to plausible" as to any of the three defendants. Twombly, 550 U.S. at 570.

## II.    Age Discrimination

Next, Hobson claims that GFA alone violated the DCHRA by discriminating on the basis of age. See D.C. Code § 2-1402.11(a)(1)(A). Generally, courts may evaluate DCHRA age claims by looking to cases interpreting the federal Age Discrimination in Employment Act (ADEA).

Badwal v. Bd. of Trs. of Univ. of D.C., 139 F. Supp. 3d 295, 315 (D.D.C. 2015); Anderson v.

BDO USA, P.C., Civ. A. No. 24-2421 (JEB), 2024 WL 4753761, at *2 (D.D.C. Nov. 12, 2024).

A prima facie case of age discrimination under the DCHRA requires that a plaintiff show (1) they

are at least forty years of age, (2) they suffered an adverse employment action, and (3) some reason

to believe the action was taken as a result of the employee's age.  Badwal, 139 F. Supp. 3d at 315.[2]

The plaintiff need not allege that age was the "but-for" cause of the adverse action, but merely that

it was a motivating factor in the decision.  Anderson, 2024 WL 4753761, at *4.[3]

In addition to alleging facts that give rise to an inference of age discrimination directly, a

plaintiff may establish such an inference "by demonstrating that [he] was treated differently from

similarly situated employees who are not part of the protected class."  George, 407 F.3d at 412.

Under the ADEA framework, to allege a discriminatory inference based on comparator evidence,

"the plaintiff must demonstrate: (1) that 'all of the relevant aspects of [his] employment situation

were nearly identical to those of the [other] employee'; and (2) that the comparator was 'charged

with offenses of comparable seriousness' but treated more favorably."  Townsend v. United States,

236 F. Supp. 3d 280, 307 (D.D.C. 2017) (citing Burley, 801 F.3d at 301).

Here, Hobson fails to sufficiently plead an age discrimination claim because his allegations

contain no factual basis to infer discrimination directly.  Instead, the complaint simply states that

Hobson was 65 years old at the time of termination, was "among the oldest employees," and that

GFA diminished his authority.  Compl. ¶¶ 10, 115-16.  These vague and generalized statements

---

[2] At times, courts cite cases describing a form of notice pleading that predates the requirements of Twombly and Iqbal.  See, e.g., Badwal, 139 F. Supp. 3d at 315 (citing Miller v. Insulation Contractors, Inc., 608 F. Supp. 2d 97, 106 (D.D.C. 2009) ("'I was turned down for a job because of my race' is all a complaint has to state to survive a motion to dismiss under Rule 12(b)(6).")).  Of course, the applicable standard is now one of plausibility, based on sufficient facts accepted as true.  Iqbal, 556 U.S. at 678.

[3] While DCHRA claims do not demand "but-for" causation, certain types of claims brought under the ADEA do, so ADEA holdings on the issue of causation must be treated with caution in DCHRA cases.  Id. at *3.

11

do not give rise to a reasonable inference of age discrimination.  Contrast Blackwell v. SecTek, Inc., 61 F. Supp. 3d 149, 161 (D.D.C. 2014) (dismissing ADEA claim after plaintiff alleged "no facts—aside from his age itself—[that] suggest[ed] that his age was a factor in [defendant's] decision to require [medical] exams" for continued employment), with Badwal, 139 F. Supp. 3d at 315-16 (holding that plaintiff plausibly alleged age discrimination by referencing conversations with HR and company officials who asked about his retirement and departure plans).  Like Blackwell, and unlike Badwal, Hobson has so far failed to plead sufficient facts to enable the Court to plausibly infer that age was a motivating factor in the adverse employment outcome.  And while a plaintiff can also allege an inference of age discrimination through a close temporal link, see Anderson, 2024 WL 4753761, at *4, Hobson fails to allege a close nexus in time between an age milestone and the adverse employment action.

Nor does Hobson allege facts sufficient to infer age discrimination through comparator evidence.  Hobson offers no evidence of a differently treated but similarly situated employee of a non-protected class.  Instead, the complaint vaguely states that GFA treated Hobson "less favorably than similarly situated younger employees."  Compl. ¶ 133.  There are no allegations about the relevant age gap, nor does the complaint identify these similarly situated younger employees.  By contrast, in Lynn v. Altarum Institute, the plaintiff stated a plausible claim through allegations that she was at least 15 years older than her colleagues, that her employer sent her signals she was expected to leave soon, and that her position had been delegated to a younger employee.  Civ. A. No. 22-459 (RBW), 2023 WL 4174332, at *5-6 (D.D.C. June 26, 2023) (citation omitted); see also O'Connor v. Consol. Coin Caterers Corp., 517 U.S. 308, 313 (1996) (holding that an inference of age-based discrimination "cannot be drawn from the replacement of one worker with another worker insignificantly younger").  And in Golden v. Mgmt. & Training

12

Corp., the plaintiff in an ADEA suit specifically identified and named the younger managers who were allegedly treated differently. 319 F. Supp. 3d 358, 376 (D.D.C. 2018). Here, Hobson's allegations are vague, conclusory, and amount to no more than a "[t]hreadbare recital[] of the elements of a cause of action." Iqbal, 556 U.S. at 678.

In response, Hobson again contends that comparator precision is not required. Opp'n to GFA Mot. to Dismiss 11 (citing Sparrow, 216 F.3d at 1114-15; Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 673-74 (1st Cir. 1996)). But for one, and as stated above, these cases predate Twombly and Iqbal, applying the since-discarded Conley standard. And under the current plausibility standard, Hobson must allege "more than a sheer possibility" that GFA engaged in age discrimination. Iqbal, 556 U.S. at 678. Instead, he must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Here, Hobson's vague and generic assertions, untethered to the specific facts of the case, amount to nothing more than a recital of the elements of a claim and do not satisfy that standard. And in Mulero-Rodriguez—a 30-year-old out-of-circuit case—the plaintiff alleged both that his employer commented that he was "too old" and altered the company's bonus system from a seniority- to merit-based system, supporting an inference of discrimination. 98 F.3d at 677. Here, Hobson's complaint alleges no facts that lead to a similar inference.

As a result, Hobson has failed to state a plausible claim of age discrimination.

## III.    Hostile Work Environment

Hobson also brings a claim for hostile work environment against all defendants under the DCHRA. See D.C. Code §§ 2-1402.11(a), (c-2). This court reviews DCHRA hostile work environment claims under the same standard as Title VII hostile work environment claims. Lively v. Flexible Packaging Ass'n, 830 A.2d 874, 887 (D.C. 2003). To prevail on such a claim, a plaintiff

must show "(1) he or she is a member of a protected class; (2) he or she was subjected to unwelcome harassment; (3) the harassment occurred because of the plaintiff's protected status; (4) the harassment was severe to a degree which affected a term, condition, or privilege of employment; and (5) the employer knew or should have known about the harassment, but nonetheless failed to take steps to prevent it." Peters v. District of Columbia, 873 F. Supp. 2d 158, 189 (D.D.C. 2012). Individual employees may be liable under the DCHRA if they are personally involved or directly participate in the discrimination or aid and abet a violation. See Doe #1 v. Am. Fed'n of Gov't Emps., 554 F. Supp. 3d 75, 118 (D.D.C. 2021); D.C. Code § 2-1402.62.

To state a hostile work environment claim, a plaintiff must allege facts that show his employer subjected him to "discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (citation modified). Courts assess hostile work environment claims under the totality of the circumstances, examining "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Id. at 23. The alleged conduct must be severe or pervasive enough "to create an objectively hostile or abusive work environment." Id. at 21.

Hobson fails to allege that the harassment occurred because of his protected status since none of the allegations give rise to an inference of discrimination based on race or age (indeed, as explained above, he separately fails to state a plausible claim for race or age discrimination). In Leftwich v. Gallaudet University, the court held that the plaintiff had sufficiently pled a hostile work environment claim after alleging negative racial comments that occurred almost daily. 878 F. Supp. 2d 81, 99-100 (D.D.C. 2012); cf. Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101,

14

120 (2002) (emphasizing on appeal from summary judgment that the plaintiff presented evidence of racial jokes, racially derogatory acts, negative comments about the capacity of Blacks to be supervisors, and racial epithets).  Unlike in Leftwich or Morgan, Hobson alleges no racial or ageist comments directed toward him.  Instead, Hobson's conclusory allegations state that the defendant's conduct was "motivated by discriminatory reasons."  Compl. ¶ 142.  That is not enough.  See Peters, 873 F. Supp. 2d at 193-94 (finding the plaintiff had not sufficiently pled a hostile work environment claim after alleging she was the "oldest supervisor" and had been excluded from certain meetings because she provided no other indication that these actions were taken due to her protected status); cf. Baloch v. Kempthorne, 550 F.3d 1191, 1201 (D.C. Cir. 2008) (holding that the plaintiff's hostile work environment claim could not prevail because "none of the comments or actions directed at [plaintiff] expressly focused on his [protected status]").

Nor does Hobson allege conduct so severe or pervasive as to alter the conditions of his employment or create an abusive working environment.  In Harris v. Mayorkas, the court held that none of the plaintiff's claims of discriminatory treatment—including restricting her responsibilities, limiting the meetings she could attend, lowering her performance evaluations, and imposing supervisory requirements on her work—were severe or pervasive enough to support a claim of hostile work environment.  Civ. A. No. 21-1083, 2022 WL 3452316, at *16 (D.D.C. Aug. 18, 2022).  Likewise here, heightened scrutiny, nonstandard managerial meetings, diminished authority, and exclusion from meetings and communications is not enough to allege a sufficiently severe or pervasive hostile work environment.  Compare Compl. ¶¶ 138-40, with Nurriddin v. Bolden, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (dismissing a Title VII hostile work environment claim because "the removal of important assignments . . . and close scrutiny of assignments by

15

management [cannot] be characterized as sufficiently intimidating or offensive in an ordinary workplace context").

Similarly, Hobson's allegations regarding Wilberding's false narratives about him, including that he had been "away from the office for two months," do not rise to the level of severe and pervasive conduct necessary to state a plausible claim. Compare Compl. ¶¶ 57, 141, with Saba v. USDA, 26 F. Supp. 3d 16, 25 (D.D.C. 2014) (stating that supervisors falsely accusing the plaintiff of violating the leave policy was "[a]nnoying" but did not "affect the terms, conditions, or privileges of employment").

In response, Hobson contends that direct slurs are not required so long as the claim rests on facts that plausibly show the plaintiff's protected status motivated the conduct. Opp'n to GFA Mot. to Dismiss 12 (citing Lively, 830 A.2d at 888-89). True enough. But the complaint here merely alleges that "similarly situated non-Black and/or younger employees" were not excluded from information and decision-making central to their roles and were not subjected to heightened scrutiny. Compl. ¶ 26. These bare conclusory allegations do not give rise to an inference that discrimination was the motivation for the alleged harassment. And this alleged harassment was not "severe" in any event. Moreover, the case Hobson cites, Lively, does him no favors. There, the facts alleged by the plaintiff (and established at trial) revealed a palpably hostile work environment that included "offensive, insulting and demeaning language about women [and] engaging in actions with sexual overtones that humiliated women." 830 A.2d at 893. Here, Hobson's complaint makes no allegations coming close to such severe and pervasive behavior.

In sum, Hobson has failed to plead a plausible hostile work environment claim.

16

**IV.    Retaliation**

Against only GFA, Hobson asserts a retaliation claim under the DCHRA.  See D.C. Code §§ 2-1402.61(a).  "The elements of a prima facie case for a DCHRA retaliation claim are the same as those under Title VII."  Martin v. District of Columbia, 78 F. Supp. 3d 279, 315 (D.D.C. 2015). To state a retaliation claim, a plaintiff must show that "(1) [he] engaged in statutorily protected activity, (2) [he] suffered a materially adverse action by [his] employer, and (3) the two are causally connected."  Spence v. Dep't of Veterans Affs., 109 F.4th 531, 539 (D.C. Cir. 2024) (citation omitted); see also District of Columbia v. Bryant, 307 A.3d 443, 450-56 (D.C. 2024) (holding that the causation standard for DCHRA retaliation claims is a "substantial contributing factor").

The DCHRA makes it unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or enjoyment of, or on account of having exercised or enjoyed, . . . any right granted or protected under this chapter."  D.C. Code § 2-1402.61(a).  "[T]he burden is squarely on the employee to adequately voice her opposition so that management is made aware of the alleged discrimination."  Howard Univ. v. Green, 652 A.2d 41, 49 (D.C. 1994).  Put differently, "a vague charge of discrimination" does not suffice to allege engagement in a statutorily protected activity because "[o]therwise, every adverse employment decision by an employer would be subject to challenge."  Id. (citation modified).  Nor is the "mere use of the word 'discrimination,' divorced from any discussion of a protected basis," sufficient "to constitute protected activity."  Hajjar-Nejad v. George Washington Univ., 37 F. Supp. 3d 90, 145 (D.D.C. 2014) (citing cases).

Hobson's retaliation claim fails because he does not allege sufficient facts to show that he engaged in a statutorily protected activity.  His pleading before this Court alleges two occasions— the April 29, 2025, complaint and the anonymous "Red Flag" report on October 17, 2025—where he complained internally of discrimination and retaliation.  Compl. ¶¶ 28, 78.  But his judicial

17

complaint provides no factual detail about the content of either internal complaint. So, the Court has no way of assessing whether the internal complaints contain sufficient factual matter to constitute protected activity rather than vague allegations or gripes about workplace friction. Insofar as Hobson provides any context, the April 2025 complaint followed disputes about leave, availability, and "exclusion from key functions," id. ¶ 27, and the October 2025 report came on the same day as a meeting between Hobson, Wilberding, and HR, in which Wilberding criticized Hobson's performance, id. ¶ 62. The nexus of his internal complaints therefore appears much closer to instances of routine workplace disputes than discriminatory conduct.[4]

Hobson's failure to provide any factual content renders his pleading deficient because "[n]ot every complaint garners its author protection under [the DCHRA]." Broderick v. Donaldson, 437 F.3d 1226, 1232 (D.C. Cir. 2006) (affirming district court's grant of summary judgment to defendants for Title VII retaliation claim). To be sure, an employee need not use any "magic words" to communicate a complaint of unlawful discrimination, but "the complaint must in some way allege unlawful discrimination, not just frustrated ambition" Id.; see also Francis v. Perez, 970 F. Supp. 2d 48, 68 n.10 (D.D.C. 2013) ("Here plaintiff's two alleged 'protected activities' . . . fall short of the Broderick standard because there is no evidence that in either complaint plaintiff alleged discrimination on the basis of religion."). The mere incantation of the words "discrimination" or "retaliation" in a post-hoc district court pleading will not suffice.

In Green, the D.C. Court of Appeals held that rumors of homosexual relationships and a conversation referencing such rumors were not enough to make out a prima facie case that

---

[4] The Court also doubts that the April 2025 complaint was sufficiently close in time to the adverse action of his firing in October 2025 to plausibly allege causation. See Spence, 109 F.4th at 540 (observing that three to four months between the protected activity and adverse action is generally the outer bound for inferring causation based only on temporal proximity and affirming dismissal of retaliation claim where ten months elapsed between complaint and termination).

otherwise solely work-related complaints were in fact about sexual orientation discrimination against heterosexuals.  652 A.2d at 43-44, 49.  And in Hajjar-Nejad, the court dismissed the plaintiff's retaliation claim after finding he had not engaged in protected activity because, "[w]hile [the] document use[d] the words 'discrimination' and 'retaliation', it never mention[ed] discrimination or retaliation on a basis protected by Title VI."  37 F. Supp. 3d at 145.

By contrast, the Court of Appeals reached a different conclusion where the plaintiff's allegations were more specific.  In Carter-Obayuwana, the court held that a plaintiff met her prima facie burden when her complaint made specific references to a "sexist mentality" and "sexism" despite not mentioning "discrimination."  764 A.2d 779, 791 (D.C. 2001).  And in Sampay, the court similarly concluded that a plaintiff met their burden by showing that their employer both knew the alleged incident was "family-related" and had contemporaneously acknowledged the complaint concerned discrimination.  294 A.3d 106, 115-16 (D.C. 2023).

Like Green and Hajjar-Nejad, and unlike Carter-Obayuwana and Sampay, Hobson provides no factual details to allow the Court to plausibly infer that his internal complaints put GFA on notice about violations of rights protected by the DCHRA—namely, race or age discrimination—rather than routine workplace friction.  Accordingly, he has not sufficiently pled that he engaged in a protected activity and he has failed to plead a plausible DCHRA retaliation claim.

## V.    Defamation

Finally, Hobson claims that GFA and Wilberding defamed him.  To state a common law defamation claim, a plaintiff must allege "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least

19

negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." KLEO AG v. Rivada Networks, Inc., 148 F.4th 741, 745 (D.C. Cir. 2025) (citation omitted). In addition to a direct defamation claim, a plaintiff may allege defamation by implication, "that is, a statement from which a reasonable person could draw a defamatory inference." Raymen v. United Senior Ass'n, 409 F. Supp. 2d 15, 21 (D.D.C.2006) (internal quotation marks and citation omitted). To establish defamation by implication, a plaintiff must plausibly allege—in addition to the defamatory inference itself—that "'the particular manner or language in which the true facts are conveyed' supplies 'additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference.'" Nunes v. WP Co., 513 F. Supp. 3d 1, 6 (D.D.C. 2020) (quoting White v. Fraternal Ord. of Police, 909 F.2d 512, 520 (D.C. Cir. 1990)).

A defamation claim will "survive[] a Rule 12(b)(6) motion to dismiss only if 'the contested statements are both verifiable and reasonably capable of defamatory meaning.'" Franklin v. Pepco Holdings, Inc., 875 F. Supp. 2d 66, 74 (D.D.C. 2012) (quoting Weyrich v. New Republic, Inc., 235 F.3d 617, 620 (D.C. Cir. 2001)). A defamatory statement "tends to injure the plaintiff in his trade, profession or community standing, or lower him in the estimation of the community." Clawson v. St. Louis Post-Dispatch, LLC, 906 A.2d 308, 313 (D.C. 2006) (quotation omitted). However, the statement "must be more than unpleasant or offensive; [it] must make the plaintiff appear odious, infamous, or ridiculous." Weyrich, 235 F.3d at 627 (quoting Howard Univ. v. Best, 484 A.2d 958, 989 (D.C.1984)).

In a defamation claim, a plaintiff can allege either "special damages" or defamation per se, in which a statement "is so likely to cause degrading injury to the subject's reputation that proof of that harm is not required to recover compensation." Franklin, 875 F. Supp. 2d at 75 (citation

20

omitted). Defamation per se "generally consists of false statements that impute to the subject a crime, a repugnant disease, a matter adversely affecting the person's ability to work in a profession, or gross sexual misconduct." Id.

Hobson fails to plausibly allege a defamation claim. The only directly quoted statement regarding Hobson is the assertion by Wilberding that he had been "away from the office for two months."[5] Compl. ¶¶ 49, 57. Granted, in Wallace v. Skadden, Arps, Slate, Meagher & Flom, the court held that "[a]n allegation that an attorney is often out of the office during normal working hours, although perhaps inconclusive on its face, could reasonably be construed, in context, as a reflection on her professional performance," and so capable of a defamatory meaning. 715 A.2d 873, 878 (D.C. 1998) (footnote omitted). But Wallace is distinguishable on two fronts.

For one, the court there noted the context of "[p]rior uncomplimentary entries in the plaintiff's file with respect to her work habits," although those were time barred and so could not themselves form the basis of liability. Id. n.4. The time-barred comments included statements that the plaintiff "played hookie," failed to meet deadlines, was unwilling to "devote sufficient time and energy to her assignments," and had an "attitude problem." Id. at 876-77. That extensive litany of previous disparaging comments contextualized and pushed over the line the stray remark about absenteeism. There is no such tapestry of disparagement here. Moreover, Wallace applied the Conley standard that a pleading should not be dismissed "unless it is beyond doubt that the plaintiff can prove no set of facts" to entitle him to relief. Id. at 877. As explained above, the

---

[5] To be sure, courts generally assume falsity at the motion to dismiss stage. Weyrich, 235 F.3d at 627. However, the complaint alleges no facts indicating that Hobson disputes having been physically absent from the office for two months. Instead, he claims that the statement amounted to a "false narrative" because he "continued substantive DC PACE Program duties, including during approved leave and business travel." Compl. ¶¶ 57-58. In that case, the statement that Hobson was "away from the office" would be literally true. See Away, Merriam-Webster's Dictionary, https://www.merriam-webster.com/dictionary/away (last visited June 3, 2026) (defining the first sense of the adjective "away" as "absent from a place."). So, Hobson seems really to be claiming defamation by implication as to that statement, but he has failed to plausibly allege additional affirmative evidence suggesting that Wilberding intended or endorsed a defamatory inference. White, 909 F.2d at 520.

applicable standard today is one of plausibility.  See Iqbal, 556 U.S. at 678.  Without more, the claim that Hobson was away from the office does not plausibly allege that he was made to look odious, infamous, or ridiculous.

The only remaining alleged defamatory statement that directly concerns Hobson is that Wilberding "falsely asserted or insinuated" at an October 17, 2025, meeting with HR that Hobson "acted improperly by showing favoritism" and "by aligning with or advocating for the borrower rather than performing his role as DC Green Bank's PACE Program Director."  Compl. ¶ 71.  But such a milquetoast statement that an investment team member advocated too eagerly for a particular borrower or deal is not reasonably capable of defamatory meaning.  See Levant v. Whitley, 755 A.2d 1036, 1046 (D.C. 2000) (affirming summary judgment for defendant because statements about plaintiff's alleged combativeness and disrespect, including claims that her actions were "bringing shame" to the business, did not rise to the level of defamation); Best, 484 A.2d at 988-89 (affirming directed verdict for defendant because a statement that department chair was "actively opposed to the present administration" was "not defamatory on its face").

And even if the alleged statements were capable of defamatory meaning, they are protected from defamation under qualified privilege.  "The law has long recognized a privilege for anything 'said or written by a master in giving the character of a servant who has been in his [or her] employment.'"  Wallace, 715 A.2d at 879 (quoting White v. Nicholls, 44 U.S. (3 How.) 266, 287 (1845)); see also id. at 879 n.8 ("Intracompany communications regarding the fitness of an employee are protected by the qualified privilege, in order to accommodate the important role of free and open intracompany communications and legitimate human resource management needs." (quotation omitted)); Turner v. Fed. Express Corp., 539 F. Supp. 2d 404, 409 (D.D.C. 2008) (same).  However, this privilege, being qualified, is "lost through publication that is outside normal

channels, or otherwise excessive, or that is made with malicious intent." Tacka v. Georgetown Univ., 193 F. Supp. 2d 43, 53 (D.D.C. 2001).

Hobson fails to plausibly allege that these intracompany statements by a supervisor to HR fall outside of this qualified privilege. See Compl. ¶¶ 49, 57, 62, 71 (alleging that Wilberding made his statements in a complaint to and a meeting with HR). For one, Hobson does not (and likely could not) allege that publication to HR was excessive, or "beyond the normal, expected scope." Turner, 539 F. Supp. 2d at 409. Without such allegations, Hobson must plausibly allege malice to overcome the privilege. See Moss v. Stockard, 580 A.2d 1011, 1024-25 (D.C. 1990).

Statements made with malice are "made with knowledge that they were false or with reckless disregard of whether they were false or not." Gregorio v. Hoover, 238 F. Supp. 3d 37, 55 (D.D.C. 2017); see also Zimmerman v. Al Jazeera Am., LLC, 246 F. Supp. 3d 257, 280-81 (D.D.C. 2017). "The actual malice standard is subjective; it is satisfied only when there is 'sufficient evidence' to suggest that 'the defendant in fact entertained serious doubts as to the truth of his publication.'" Zimmerman, 246 F. Supp. 3d at 274 (quoting St. Amant v. Thompson, 390 U.S. 727, 731 (1968)).[6] Neither a failure to investigate a claim before repeating it, standing alone, nor an extreme departure from ordinary standards of investigation and reporting can provide the required degree of recklessness. Id. at 281 (quoting Harte-Hanks Commc'ns, Inc. v. Connaughton, 491 U.S. 657, 692 (1989)). But "if there is evidence that a defendant had an obvious reason to doubt the veracity of a source, then the defendant's failure to investigate the source's allegation prior to publication can be probative of actual malice." Id. at 283.

---

[6] In St. Amant v. Thompson, the Supreme Court set forth three examples of circumstantial evidence that could support such an inference of subjective recklessness. See 390 U.S. at 732. "Those are: (1) evidence that indicates the defendant fabricated the story, or (2) evidence that suggests the allegedly defamatory statements are so inherently improbable that only a reckless man would have put them in circulation[,] or (3) evidence that demonstrates that there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." Zimmerman, 246 F. Supp. 3d at 281 (internal quotation marks and citation omitted). Here, the first two examples do not apply.

Hobson makes a conclusory assertion of reckless disregard for falsity, Compl. ¶ 161, but does not plausibly allege such recklessness. The complaint sets forth no factual allegations suggesting that Wilberding harbored any subjective doubt as to the truth of his statements to HR regarding Hobson's absence from work or his performance. Granted, Hobson does allege that Wilberding's allegations were demonstrably false and that GFA failed to investigate Wilberding's allegations. Id. ¶¶ 59, 63-64. But GFA did not thereafter publish Wilberding's allegations, so any duty to investigate before publication where a source's veracity is obviously doubtful did not arise. As a result, Hobson fails to state a typical defamation claim.

Likewise, Hobson fails to allege defamation by implication. Hobson contends that Wilberding's statements about the borrower and the capital provider's representative form part of a larger narrative that he enabled personal gain and mishandled program duties to allow the borrower who was "gaming the system" to receive "$4 million in her pocket." Id. ¶ 158. In the complaint, however, Hobson merely alleges statements that the borrower was "improperly extracting personal financial benefit" and the capital provider's representative was "acting like he's an employee" of the borrower. Id. ¶¶ 67-68. The complaint noticeably lacks any factual allegation to connect the statements regarding any improper financial gain by the borrower to Hobson. Cf. Kitt v. Capital Concerts, Inc., 742 A.2d 856, 859-60 (D.C. 1999) (affirming summary judgment for defendant alleging false light because brief promotional video of actor playing clarinet was not "of and concerning" principal clarinetist). Hobson provides no evidence that "the particular manner or language" of the statements "supplies additional, affirmative evidence suggesting that [GFA] intend[ed] or endors[ed]" this inference. White, 909 F.2d at 520; see also Nunes, 513 F. Supp. 3d at 7 (dismissing a defamation by implication claim where the "[p]laintiff

24

point[ed] to no facts to support the inference"). Hence, Hobson fails to plausibly allege defamation by implication.

Finally, Hobson fails to state a claim of defamation per se. "Only 'statements about extreme subjects' are considered defamatory per se." KLEO, 148 F.4th at 746 (quoting Smith v. Clinton, 886 F.3d 122, 128 (D.C. Cir. 2018)). None of the alleged statements impute to Hobson "a matter adversely affecting [his] ability to work in a profession." Franklin, 875 F. Supp. 2d at 75 (citation omitted). Rather, the statements at issue describe garden-variety workplace concerns regarding Hobson's performance and attendance at the office, which do not portray Hobson as being so incompetent as to fall "woefully short of basic professional standards" or otherwise impute "professional malfeasance or ineptitude" of the kind that would affect his ability to work in the profession. See KLEO AG, 148 F.4th at 746-47. And while "impugning someone's 'honesty in business' can be defamatory per se," id. at 747 (quotation omitted), here, the alleged statements made by Wilberding (that were actually about Hobson) were merely that Hobson favored and advocated for a particular borrower, Compl. ¶ 71. Although Hobson offers legal conclusions that the statements "impute professional unfitness, dishonesty, and lack of integrity," id. ¶ 162, such assertions are "no substitute for well-pleaded facts explaining how that is so," KLEO AG, 148 F.4th at 747.

As a result, Hobson fails to plausibly allege defamation under any of his three theories.

**CONCLUSION**

For the foregoing reasons, the Court will grant defendants' motions to dismiss.[7] A separate order will accompany this opinion.

---

[7] Because Hobson could cure the deficiencies in his claims by pleading more facts, the Court will dismiss his claims without prejudice. See Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996).

26

 

 

 

 

/s/
_____
JOHN D. BATES
United States District Judge

Date: <u>June 30, 2026</u>